# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM and FRESNO COUNTY EMPLOYEES' RETIREMENT ASSOCIATION, Individually and on Behalf of All Others Similarly Situated, | Case No. 13-cv-7183 (JSR) |
| Plaintiffs, | ECF CASE |
| v. | |
| BANKRATE, INC. et al., | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Max W. Berger
Salvatore J. Graziano
John J. Rizio-Hamilton
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Lead Plaintiffs Arkansas Teacher Retirement System and Fresno County Employees' Retirement Association and the Settlement Class*

Dated:  October 17, 2014

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................................ii

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ............................................................................................................................ 3

I.      THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL ........................ 3

        A.      The Settlement Was Reached After Arm's-Length Negotiations
                Conducted Under the Auspices of an Experienced Mediator, and Is
                Procedurally Fair ............................................................................................. 4

        B.      Application of the *Grinnell* Factors Supports Approval of the Settlement
                as Substantively Fair, Reasonable and Adequate ........................................... 7

                1.      The Complexity, Expense and Likely Duration of the Litigation
                        Support Approval of the Settlement ....................................................... 8

                2.      The Reaction of the Settlement Class to the Settlement ......................... 9

                3.      The Stage of the Proceedings and the Amount of Information
                        Available to Counsel Support Approval of the Settlement .................... 10

                4.      The Risks of Establishing Liability and  Damages Support
                        Approval of the Settlement ................................................................... 12

                        (a)     Risks To Proving Liability ......................................................... 12

                        (b)     Risks To Proving Damages and Loss Causation .......................... 15

                5.      The Ability of Defendants to Withstand a Greater Judgment .................. 19

                6.      The Range of Reasonableness of the Settlement Fund in Light of
                        the Best Possible Recovery and all the Attendant Risks of
                        Litigation Support Approval of the Settlement ..................................... 20

II.     THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD
        BE APPROVED .......................................................................................................... 21

III.    NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS
        OF RULE 23 AND DUE PROCESS ........................................................................... 23

CONCLUSION ......................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advanced Battery Techs. Inc. Sec. Litig.*,
 298 F.R.D. 171 (S.D.N.Y. 2014) ...............................................................................7, 11, 24

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
 293 F.R.D. 459 (S.D.N.Y. 2013) ...........................................................................................4

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
 No. 02 Civ. 5575 (SWK), 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ..................................11

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
 909 F. Supp. 2d 259 (S.D.N.Y. 2012).......................................................................5, 7, 9, 21

*In re Citigroup Inc. Bond Litig.*,
 296 F.R.D. 147 (S.D.N.Y. 2013) ......................................................................................3, 7

*In re Citigroup Inc. Sec. Litig.*,
 No. 09 MD 2070 (SHS), 2014 WL 2112136 (S.D.N.Y. May 20, 2014) ..................................4

*City of Detroit v. Grinnell Corp.*,
 495 F.2d 448 (2d Cir. 1974)...........................................................................................7, 12, 20

*D'Amato v. Deutsche Bank*,
 236 F.3d 78 (2d Cir. 2001).................................................................................................5, 19

*Eisen v. Carlisle & Jacquelin*,
 417 U.S. 156 (1974)................................................................................................................23

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
 No. 02-CV-3400 (CM)(PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)...........8, 9, 20, 21

*Fort Worth Emp'rs' Ret. Fund v. Biovail Corp.*,
 615 F. Supp. 2d 218 (S.D.N.Y. 2009)...................................................................................17

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
 279 F.R.D. 151 (S.D.N.Y. 2011) .................................................................................4, 5, 21

*In re Gilat Satellite Networks*, *Ltd.*,
 No. CV-02-1510, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ...........................................8

*In re Global Crossing Sec. & ERISA Litig.*,
 225 F.R.D. 436 (S.D.N.Y. 2004) ...........................................................................................7

*In re IMAX Sec. Litig.*,
    283 F.R.D. 178 (S.D.N.Y. 2012) ................................................................4, 19, 20, 21

*In re Initial Pub. Offerings Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009)......................................................................21

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
    233 F.R.D. 306 (E.D.N.Y. 2006) ...............................................................................8

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)......................................................................11

*In re Marsh & McLennan Cos. Sec. Litig.*,
    No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. 2009) .................................24

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) .............................................................................21

*McBean v. City of New York*,
    233 F.R.D. 377 (S.D.N.Y. 2006) .............................................................................20

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ...............................................................................7

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972)....................................................................................20

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997)..............20, 21

*Shapiro v. JPMorgan Chase & Co.*,
    No. 11 Civ. 8331 (CM) (MHD), 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014).......................7

*In re Sony SXRD Rear Projection Television Class Action Litig.*,
    No. 06-cv-5173 (RPP), 2008 WL 1956267 (S.D.N.Y. May 1, 2008) ....................11

*In re Veeco Instruments Inc. Sec. Litig.*,
    No. 05 MDL 01695 (CM), 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ............6, 9

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005)...........................................................................4, 7, 23

*White v. First Am. Registry, Inc.*,
    No. 04 Civ. 1611 (LAK), 2007 WL 703926 (S.D.N.Y. Mar. 7, 2007)......................8

**Rules and Statutes**

15 U.S.C. § 78u-4(a)(7) ............................................................................................23

Fed. R. Civ. P. 23(c)(2)(B) ...................................................................................................23

Fed. R. Civ. P. 23(e) ...............................................................................................1, 3, 23

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs, Arkansas Teacher Retirement System and Fresno County Employees' Retirement Association ("Lead Plaintiffs"), on behalf of themselves and the Settlement Class, respectfully submit this memorandum of law in support of their motion for final approval of the proposed settlement resolving all claims asserted in the Action in return for the payment of $18 million in cash for the benefit of the Settlement Class (the "Settlement"), and for approval of the proposed plan of allocation of the proceeds of the Settlement (the "Plan of Allocation").[1]

## PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiffs have agreed to settle all claims in the Action in exchange for a cash payment of $18 million, which has been deposited into an escrow account. Lead Plaintiffs respectfully submit that the proposed Settlement is a very favorable result for the Settlement Class and satisfies the standards for final approval under Rule 23 of the Federal Rules of Civil Procedure.  As detailed in paragraphs 44 to 68 of the accompanying Rizio-Hamilton Declaration[2] and as set forth herein, the Settlement represents a substantial percentage of likely

---

[1] Unless otherwise indicated, all capitalized terms shall have the meanings ascribed to them in the Amended Stipulation and Agreement of Settlement dated September 17, 2014 (ECF No. 73-1) (the "Amended Stipulation") or in the Declaration of John Rizio-Hamilton in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Rizio-Hamilton Declaration" or "Rizio-Hamilton Decl."), filed herewith.  Citations to "¶" in this memorandum refer to paragraphs in the Rizio-Hamilton Declaration.

[2] The Rizio-Hamilton Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Action (¶¶ 10-25); the nature of the claims asserted (¶ 16); the negotiations leading to the Settlement (¶¶ 26-42); the risks and uncertainties of continued litigation (¶¶ 44-68); the terms of the Plan of Allocation for the Settlement proceeds (¶¶ 75-83); and a description of the services Lead Counsel provided for the benefit of the Settlement Class (¶¶ 4, 10-42).

recoverable damages as estimated by Lead Plaintiffs' expert, and is an excellent recovery given the many risks inherent in this litigation with respect to liability, damages, and loss causation.

At the time the agreement to settle was reached, Lead Plaintiffs and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the Action.  Before the Settlement was agreed to, Lead Counsel had (i) conducted a wide-ranging investigation of the insurance lead business of Bankrate, Inc. ("Bankrate" or the "Company"), which included an extensive review of SEC filings, press releases, news reports and other public information, interviews with more than 60 former Bankrate employees, and consultation with a damages expert; (ii) researched and drafted an initial complaint and a detailed amended complaint; (iii) successfully opposed Defendants' motion to dismiss through briefing and oral argument; and (iv) engaged in an intensive mediation process overseen by former federal District Court Judge Layn Phillips, which involved the exchange of written submissions concerning liability and damages, preparing responses to numerous confidential written questions posed by Judge Phillips, and engaging in a full-day formal mediation session.  ¶¶ 4, 10, 14-21, 26-29.  Lead Plaintiffs' and Lead Counsel's understanding of the strengths and weaknesses of the case was further enhanced by comments from Judge Phillips at the mediation, which ultimately culminated in his mediator's recommendation that the case be settled for $18 million, a recommendation that was accepted by the Parties.  ¶¶ 29-30.

Additionally, as a condition of the Settlement, Lead Plaintiffs conducted discovery, and reserved the right to withdraw from the Settlement pending the completion of this discovery. Lead Plaintiffs' discovery was substantial, and included reviewing nearly 145,000 pages of documents, interviewing both Individual Defendants (Bankrate's former CEO Thomas R. Evans and former CFO Edward J. DiMaria), and deposing the CEO of Bankrate Insurance, the officer

in charge of the Company's insurance lead business.  This discovery confirmed Lead Counsel's assessment of the Settlement as fair and reasonable.  ¶¶ 32-36.

The Settlement is a favorable result in light of the substantial risks of continued litigation. While Lead Plaintiffs believe that the claims asserted against Defendants are meritorious, they recognize that the Action presented a number of substantial risks to establishing both liability and damages.  As detailed in the Rizio-Hamilton Declaration and discussed further below, Defendants had serious arguments with respect to liability, including numerous arguments that they did not make materially misleading misstatements or act with *scienter*.  *See* ¶¶ 45-53. Moreover, although damages arguments were not before the Court on the motion to dismiss, Defendants had many significant arguments on this issue, including that the majority of Bankrate's common shares were held by insiders who were excluded from the class, which sharply limited the number of shares eligible for damages, and that loss causation could not be established for either of the stock drops at issue here.  *See* ¶¶ 54-66.  Absent the Settlement, the Parties faced the prospect of protracted litigation through costly fact and expert discovery, additional contested motions, a trial, post-trial motion practice, and likely ensuing appeals.  The Settlement avoids these risks while providing a substantial, certain and immediate benefit to the Settlement Class in the form of an $18 million cash payment.

In light of these considerations, Lead Plaintiffs and Lead Counsel respectfuly submit that the Settlement warrants final approval by the Court.

## ARGUMENT

## I.  THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action settlement must be presented to the Court for approval.  The Settlement should be approved if the Court finds it "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *see In re Citigroup Inc. Bond*

*Litig.*, 296 F.R.D. 147, 154 (S.D.N.Y. 2013); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 293 F.R.D. 459, 464 (S.D.N.Y. 2013).

Public policy favors the settlement of disputed claims among private litigants, particularly in class actions. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("*Visa*") ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'") (citation omitted). In ruling on final approval of a class settlement, the court should examine both the negotiating process leading to the settlement, and the settlement's substantive terms. *See Visa*, 396 F.3d at 116; *In re Citigroup Inc. Sec. Litig.*, No. 09 MD 2070 (SHS), 2014 WL 2112136, at *2-*3 (S.D.N.Y. May 20, 2014); *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 188 (S.D.N.Y. 2012); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011).

### A.   The Settlement Was Reached After Arm's-Length Negotiations Conducted Under the Auspices of an Experienced Mediator, and Is Procedurally Fair

The Settlement was achieved after arm's-length negotiations between well-informed and experienced counsel conducted under the auspices of an extremely experienced mediator. Following the resolution of the motion to dismiss, the Parties explored the possibility of settlement through mediation, and selected Judge Phillips, a highly experienced mediator of securities class actions, as mediator. ¶ 26. As part of the mediation process facilitated by Judge Phillips, the Parties exchanged written submissions concerning liability and damages, including submissions by their respective damages experts. *Id.* The Parties also responded to a series of detailed confidential questions posed by Judge Phillips in advance of the mediation session. ¶ 28. In addition, the Parties' damages experts convened a phone conference in advance of the in-person mediation, during which they discussed certain of Defendants' damages-related arguments. ¶ 27.

On May 30, 2014, the Parties engaged in a full-day formal mediation session.  ¶ 29.  At the conclusion of the mediation, the Parties were unable to come to agreement.  *Id*.  On May 31, 2014, Judge Phillips made a mediator's recommendation that the Action be settled for $18 million.  *Id*.  The Parties accepted Judge Phillips' recommendation on June 5, 2014.  ¶ 30.

A Term Sheet memorializing the agreement in principle to settle was executed on June 6, 2014.  ¶ 30.  A condition of the agreement to settle was that Lead Plaintiffs would conduct confirmatory discovery to verify the reasonableness of the Settlement and have the right to withdraw from the proposed Settlement if they, in their good faith discretion, determined that information produced during that discovery rendered the proposed Settlement unfair, unreasonable or inadequate.  ¶¶ 31-33.  Review of the documents produced, and the interviews and testimony given in connection with this discovery, confirmed Lead Plaintiffs' and Lead Counsel's belief that the Settlement is fair, reasonable and adequate.  ¶¶ 34-36.

The arm's-length nature of the settlement negotiations and the involvement of an experienced mediator like Judge Phillips support the conclusion that the Settlement is fair and was achieved free of collusion.  *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a mediator's involvement in settlement negotiations "helps to ensure that the proceedings were free of collusion and undue pressure"); *In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (finding a settlement fair where the parties engaged in  "arm's length negotiations," including mediation before "retired federal judge Layn R. Phillips, an experienced and well-regarded mediator of complex securities cases"); *Giant Interactive*, 279 F.R.D. at 160 (settlement was entitled to a presumption of fairness where it was the product of "arms-length negotiation" facilitated by Judge Phillips, "a respected mediator").

The Parties and their counsel were knowledgeable about the strengths and weaknesses of the case prior to reaching the agreement to settle.  Lead Plaintiffs had conducted an extensive investigation prior to filing the Complaint, which included interviews with more than 60 former Bankrate employees and a thorough review of publicly available information; prepared a detailed Complaint and briefing in opposition to Defendants' motion to dismiss; consulted with a damages expert; and had the benefit of mediation statements and discussions with Defendants' damages expert setting forth their arguments on liability, damages, and loss causation.  ¶¶ 4, 14-21, 26-28, 66.  As a result, Lead Plaintiffs and Lead Counsel had an adequate basis for assessing the strength of the Settlement Class's claims and Defendants' defenses when they entered into the Settlement.  ¶ 4.  This assessment was buttressed by the confirmatory discovery taken.  ¶¶ 4, 34-36.

The conclusion of Lead Plaintiffs and Lead Counsel that the Settlement is fair and reasonable and in the best interests of the Settlement Class further supports its approval.  Lead Plaintiffs are sophisticated institutional investors that took an active role in supervising this litigation, as envisioned by the PSLRA.  *See* Declaration of George Hopkins, Executive Director of ATRS, attached as Exhibit 2 to the Rizio-Hamilton Declaration at ¶¶ 2-5; Declaration of Becky Van Wyk, Assistant Retirement Administrator of Fresno County Employees' Retirement Association, attached as Exhibit 3 to the Rizio-Hamilton Declaration at ¶¶ 2-5.  A settlement reached "under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness.'"  *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007).

In addition, the judgment of Lead Counsel, which is highly experienced in securities class action litigation, that the Settlement is in the best interests of the Settlement Class is entitled to

"great weight." *Shapiro v. JPMorgan Chase & Co.*, No. 11 Civ. 8331 (CM) (MHD), 2014 WL 1224666, at *2 (S.D.N.Y. Mar. 24, 2014); *accord In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) (courts have consistently given "'great weight' . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation") (citation omitted).

### B.    Application of the *Grinnell* Factors Supports Approval of the Settlement as Substantively Fair, Reasonable and Adequate

The Settlement is also substantively fair, reasonable, and adequate.    The standards governing approval of class action settlements are well established in this Circuit.    In *City of Detroit v. Grinnell Corp.*, the Second Circuit held that the following factors should be considered in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974) (citations omitted), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000), *see also Visa*, 396 F.3d at 117; *In re Advanced Battery Techs. Inc. Sec. Litig.*, 298 F.R.D. 171, 175 (S.D.N.Y. 2014); *Citigroup Bond*, 296 F.R.D. at 155; *Bear Stearns*, 909 F. Supp. 2d at 265-66.

"In finding that a settlement is fair, not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.'"    *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (quoting *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003)); *see Advanced Battery Techs.*, 298 F.R.D. at 175 (same).    Additionally, in deciding whether to

approve a settlement, a court "should not attempt to approximate a litigated determination of the merits of the case lest the process of determining whether to approve a settlement simply substitute one complex, time consuming and expensive litigation for another." *White v. First Am. Registry, Inc.*, No. 04 Civ. 1611 (LAK), 2007 WL 703926, at *2 (S.D.N.Y. Mar. 7, 2007).

Here, the Settlement satisfies the criteria for approval articulated in *Grinnell*.

### 1.    The Complexity, Expense and Likely Duration of the Litigation Support Approval of the Settlement

"[I]n evaluating the settlement of a securities class action, federal courts, including this Court, 'have long recognized that such litigation is notably difficult and notoriously uncertain.'" *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM)(PED), 2010 WL 4537550, at *15 (S.D.N.Y. Nov. 8, 2010) (citation omitted). Indeed, courts recognize that "[s]ecurities class actions are generally complex and expensive to prosecute." *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007). Accordingly, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

This case was no exception. Achieving a litigated verdict in the Action for Lead Plaintiffs and the class would have required substantial additional time and expense. The agreement to settle was reached shortly after resolution of the motion to dismiss, when initial discovery documents had been exchanged by the Parties, but production of documents in discovery had not yet been made. ¶¶ 24-30. In the absence of the Settlement, the continued litigation of the Action would have required extensive fact discovery, expert discovery on issues such as loss causation and damages, a litigated motion for class certification, an expected motion for summary judgment, a trial, and post-trial motion practice. Finally, whatever the outcome at

trial, it is virtually certain that appeals would be taken from any verdict.  The foregoing would pose substantial expense for the Settlement Class and delay the class's ability to recover – assuming, of course, that Lead Plaintiffs were ultimately successful on their claims.

In contrast to costly, lengthy and uncertain litigation, the Settlement provides an immediate, significant and certain recovery of $18 million for members of the Settlement Class. Accordingly, this factor supports approval of the Settlement.

<strong>2.      The Reaction of the Settlement Class to the Settlement</strong>

The reaction of the class to a proposed settlement is a significant factor to be weighed in considering its fairness and adequacy.  *See, e.g., Bear Stearns*, 909 F. Supp. 2d at 266-67; *FLAG Telecom*, 2010 WL 4537550, at *16; *Veeco*, 2007 WL 4115809, at *7.

Pursuant to the Amended Preliminary Approval Order, the Court-appointed Claims Administrator, The Garden City Group, Inc. ("GCG"), began mailing copies of Notice Packet (consisting of the Notice and Claim Form) to potential Settlement Class Members and nominees on September 26, 2014.  *See* Declaration of Jose C. Fraga Regarding (A) Mailing of the Notice and Proof of Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date, Exhibit 1 to the Rizio-Hamilton Declaration ("Fraga Decl."), at ¶¶ 2-5.  As of October 16, 2014, GCG had mailed a total of 21,649 copies of the Notice Packet to potential Settlement Class Members and nominees.  *See id*. ¶ 8.  In addition, the Summary Notice was published in *Investor's Business Daily* and transmitted over the *PR Newswire* on October 9, 2014.  *See id*. ¶ 9.  The Notice set out the essential terms of the Settlement and informed potential Settlement Class Members of, among other things, their right to opt out of the Settlement Class or object to any aspect of the Settlement, as well as the procedure for submitting Claim Forms.  While the deadline set by the Court for Settlement Class Members to exclude themselves or object to the Settlement has not yet passed, to date, no objections to the

Settlement or the Plan of Allocation and no requests for exclusion have been received.  The deadline for submitting objections and requesting exclusion from the Settlement Class is October 31, 2014.  As provided in the Amended Preliminary Approval Order, Lead Plaintiffs will file reply papers no later than November 14, 2014 addressing any requests for exclusion and objections that may be received.

### 3. The Stage of the Proceedings and the Amount of Information Available to Counsel Support Approval of the Settlement

Lead Counsel spent significant time and resources analyzing and litigating the legal and factual issues in this Action.  Lead Counsel conducted a substantive investigation into these issues prior to initiating the lawsuit and in the process of preparing the amended complaint. Among other things, Lead Counsel (i) conducted a thorough review of publicly available information concerning Bankrate's insurance lead business, including SEC filings, analyst reports, investor presentations, news articles and other public data, (ii) interviewed numerous former Bankrate employees, and (iii) retained and consulted with an expert in damages and loss causation.  ¶¶ 4, 14-15.

Lead Counsel also learned the defenses to the claims asserted in the Action through briefing and oral argument of the motion to dismiss; Defendants' mediation statement, which concerned both liability and damages, and contained a detailed analysis of damages and loss causation prepared by Defendants' expert; and consultations between Defendants' damages expert and Lead Plaintiffs' expert.  ¶¶ 17-21, 26-29, 66.  Thus, at the time the agreement in principle to settle was reached, Lead Plaintiffs and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the case.

Lead Plaintiffs also had the benefit of substantial discovery, which was a condition of the agreement to settle.  ¶¶ 32-35.  In connection with this discovery, Lead Counsel obtained and

analyzed nearly 145,000 pages of internal Bankrate documents that were responsive to Lead Plaintiffs' document requests.  ¶ 34.  Lead Counsel also conducted interviews with both Individual Defendants – Bankrate's former CEO Thomas R. Evans and former CFO Edward J. DiMaria – and took the deposition of the Bankrate officer in charge of the Company's insurance lead business, Jeff Grant.  ¶ 35.

As a result of Lead Counsel's substantive investigation, the litigation of the motion to dismiss, and the mediation process, and as confirmed by the discovery conducted, Lead Plaintiffs and Lead Counsel had a "sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement." *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. 02 Civ. 5575 (SWK), 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006); *see also Advanced Battery Techs.*, 298 F.R.D. at 177 (this factor "focuses on whether the plaintiffs 'obtained sufficient information through discovery to properly evaluate their case and to assess the adequacy of any settlement proposal'" and thus, even where "no merits discovery occurred," counsel that had conducted their own investigation, engaged in detailed briefing, and conducted targeted confirmatory discovery were "knowledgeable with respect to possible outcomes and risks in this matter and, thus, able to recommend the Settlement") (citation omitted); *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173 (RPP), 2008 WL 1956267, at *7 (S.D.N.Y. May 1, 2008) ("pre-settlement informal discovery and confirmatory discovery . . . allowed the parties to develop the facts necessary to evaluate the claims and adequacy of the Settlement"); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 364 (S.D.N.Y. 2002) (where discovery had not begun, "Plaintiffs' Counsel possessed a record sufficient to permit evaluation of the merits of Plaintiffs' claims, the strengths of the

defenses asserted by Defendants, and the value of Plaintiffs' causes of action for purposes of settlement").

Based on the information developed, Lead Plaintiffs and Lead Counsel were knowledgeable about the strengths and weaknesses of the claims and believe that the Settlement represents a resolution that is highly favorable to the Settlement Class.

### 4. The Risks of Establishing Liability and Damages Support Approval of the Settlement

In assessing the fairness, reasonableness and adequacy of a settlement, courts should consider the "risks of establishing liability [and] the risks of establishing damages." *Grinnell*, 495 F.2d at 463 (citations omitted). While Lead Plaintiffs had prevailed at the motion to dismiss stage, Lead Plaintiffs and the class faced very substantial risks in proving both liability and damages at trial, as explained below. In light of the substantial hurdles faced by Lead Plaintiffs, there was a very serious risk that, had Lead Plaintiffs engaged in additional litigation, including a trial and likely appeals, they would not recover an amount larger than the Settlement.

### (a) Risks To Proving Liability

Defendants had meaningful defenses to liability in this case. In particular, Lead Plaintiffs faced significant challenges in proving that Defendants made materially misleading statements or acted with *scienter*.

Proving the material falsity of Defendants' alleged misstatements was fraught with risk. As the Court is aware, the gravamen of this case was that (i) between the start of the Class Period and the first alleged corrective disclosure on May 1, 2012, Defendants stated that Bankrate's insurance leads were "high quality," when a material amount of the leads were of poor quality, and (ii) between May 1, 2012 and the end of the Class Period on October 15, 2012, Defendants stated that they had taken steps to improve Bankrate's lead quality and that these efforts were

"very much on track" and lead quality had "improved," when, in reality, Bankrate continued to generate or acquire a material amount of poor quality leads.  At the motion to dismiss stage, Defendants argued strenuously, although unsuccessfully, that these statements were inactionable puffery.  At trial, Defendants would certainly have renewed this argument, and there was a real risk that a jury would conclude that those statements were too generalized or subjective to demonstrate fraud.  ¶ 46.

Defendants also had substantial arguments that their statements were not materially false or misleading because they placed investors on notice of Bankrate's lead quality problems and their potential impact on its financial performance, long before the alleged May 1, 2012 and October 15, 2012 corrective disclosures.  At summary judgment or trial, Defendants could point to multiple statements prior to May 1, 2012 to argue that they disclosed the fact that Bankrate was experiencing lead quality problems, that they were cleaning up the insurance lead business through a "quality initiative" that would take time to implement, and that this strategy would decrease revenue in the near term.  *See* ¶ 47.  Defendants would have further pointed to contemporaneous market commentary as confirmation that investors were well aware of these facts, including, for example, reports published immediately after the alleged May 1 corrective disclosure stating that "the slowdown [in insurance revenue] was expected as RATE accelerates efforts to clean out low quality players in its insurance lead generation business," and that "[w]eakness in insurance leads was expected."  *Id*.

During the second half of the Class Period, Defendants would have argued that their disclosure of adverse information became even more detailed and pronounced.  For example, Defendants would have contended that they specifically informed investors that Bankrate was experiencing significant lead quality issues, that repairing these problems was a difficult task that

would take time to accomplish, and that these issues would continue to negatively impact Bankrate's financial performance through the third quarter of 2012, *i.e.*, through the end of the Class Period.  Among other things, Defendants would have pointed to their statements in May and June 2012 that "we're right in the middle of it [cleaning up lead quality] now, when it's kind of the messiest," "it's a little like putting 10 pounds of you-know-what into a five pound bag," "it's going to take a few quarters to realize the full impact and full benefit of that [insurance leads clean-up] strategy," and "[t]he [revenue impact] numbers are bigger than we thought they were going to be to be completely honest. . . . [I]t's a little like playing a Whack a Mole.  You think you've got them [the bad leads] over here and they pop up somewhere else . . . ." ¶ 48.

Defendants would have again asserted that extensive market commentary confirmed that investors understood the problems that the Company was facing and their continued impact on its financial performance.  For instance, Defendants would have pointed to the fact that, immediately after Defendants' May 1 disclosures, several analysts lowered their estimates of Bankrate's financial performance specifically "to account for the lower insurance lead revenue," noting that "RATE is undergoing a structural shift to improve insurance lead quality, which should take a few more quarters to cycle through." ¶ 49.  Given Defendants' disclosures and the contemporaneous market commentary summarized above and set forth in greater detail in the Rizio-Hamilton Declaration (*see* ¶¶ 47-49), there was a significant risk that a fact-finder could conclude that Defendants' statements, considered in their totality, were not materially false or misleading.

If Lead Plaintiffs were able to overcome these risks and prove material falsity, they faced significant additional challenges in proving *scienter*.  For example, Defendants would have argued that they repeatedly disclosed negative information about Bankrate's insurance leads

business, as summarized above, and therefore their conduct did not rise to the level of a fraud. ¶ 50.

In addition, Defendants would have argued that Bankrate purchased nearly all of its insurance leads from third-party "affiliates," and thus, Bankrate did not control their quality. Defendants would have further contended that, as soon as they became aware that an affiliate was selling Bankrate poor quality leads, they stopped purchasing leads from that source – even if it meant reducing Bankrate's revenue stream.   The reasonable inference to be drawn from such conduct, Defendants would have asserted, is one of good faith, not fraud.   ¶ 51.

Defendants also would have contended that they made reasonable efforts to uncover and correct the lead quality problems, but did not learn of the true magnitude of the problems until the end of the Class Period.   Specifically, they would have contended that they repeatedly requested disposition data from their insurance carrier clients – *i.e.*, data reflecting lead quality— but did not receive a significant portion of this data until the very end of the Class Period, at which time they identified a large amount of poor quality leads.   Defendants would have asserted that, after receiving this data, they promptly removed those leads from Bankrate's revenue stream, and disclosed the full scope of the problem publicly.   ¶ 52.

Moreover, Defendants would have argued that they lacked a motive to commit fraud. While Lead Plaintiffs argued at the motion to dismiss stage that Defendants engaged in suspicious insider trading, Defendants asserted that they retained very significant portions of their Bankrate stock even as it lost value, causing them to suffer significant losses alongside the Company's shareholders. ¶ 53.

     **(b)**     <u>**Risks To Proving Damages and Loss Causation**</u>

Assuming that Lead Plaintiffs were successful in developing the evidence needed to defeat all of the above risks and successfully prove liability at trial, they faced very significant

risks in proving damages and loss causation.  Although questions concerning loss causation and the extent of damages were not before the Court at the motion to dismiss stage, these issues were the key driver of the Settlement.  As explained below, Defendants would have vigorously asserted that damages in this case were greatly minimized, if not eliminated, by two factors: (i) the Company's small public float during the Class Period, and (ii) substantial difficulties in establishing loss causation and damages for both corrective disclosure days.

As the Court is aware, this case concerned two alleged corrective disclosures: (i) May 1, 2012, when Bankrate disclosed that it had eliminated approximately $12 million of poor quality insurance leads from its revenue stream, and (ii) October 15, 2012, when Bankrate disclosed disappointing quarterly results and stated that it had eliminated a material additional amount of poor quality insurance leads from its revenue stream.   ¶ 57.   From the outset, however, Defendants had powerful arguments that the potentially recoverable damages for the stock price declines following these disclosures were substantially limited by the very small size of the public float.  During the Class Period, Apax Partners, a dismissed defendant, and other insiders held between 56% and 80% of Bankrate's outstanding common stock.  Given that Lead Plaintiffs would have taken the position that Apax Partners and other Bankrate insiders were excluded from the class and could not participate in any recovery, Defendants had compelling arguments that the large majority of Bankrate's common shares could not be included in any damage calculation.  ¶ 55.

Moreover, Defendants had extremely substantial loss causation arguments that, if accepted, would have further reduced or potentially eliminated the amount of recoverable damages.  As the Court is aware, Lead Plaintiffs bear the burden of establishing loss causation by proving that "plaintiff's losses were caused by the disclosure of the truth that Defendants had

previously allegedly misrepresented." *Fort Worth Emp'rs' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009). Defendants would have vigorously contended that Lead Plaintiffs could not carry their burden as to either corrective disclosure day.

As to the May 1 disclosures, Defendants would have relied on statements they made before May 1, summarized above and at paragraphs 47 to 49 of the Rizio-Hamilton Declaration, to argue that they had informed investors that Bankrate was experiencing lead quality problems and that fixing these problems would impact its financial performance. Defendants also would have pointed to market commentary as confirmation that investors knew that Bankrate's revenues would be impacted by the clean-up of its insurance leads, including analysts who reported that Bankrate's May 1 announcements were "generally in line with the management's internal plan" and that "[w]eakness in insurance leads was expected." ¶ 59. Based on these facts, Defendants would have forcefully contended that the disclosures concerning the insurance lead business on May 1 were not responsible for the stock price decline on May 2. *Id.*

Indeed, Defendants would have argued that the market understood that removing poor quality insurance leads from Bankrate's revenue stream was a positive development that would improve Bankrate's financial performance. Defendants again would have pointed to multiple analyst reports opining that Bankrate's removal of poor quality leads was "a long-term positive" and "will ultimately drive significant growth . . . for Bankrate." ¶ 60. Based on these facts, Defendants would have contended that the May 1 disclosure concerning lead quality did not cause the Company's stock price to decline.

Notably, Defendants would have had substantial arguments that news concerning Bankrate's credit card business – which was unrelated to the fraud alleged here – was the actual cause of Bankrate's stock price decline on May 2. Defendants would have argued that, on May

1, they announced results for the Company's credit card business that were surprisingly weak and below market expectations, while the results for the insurance business were expected. Defendants would have argued that market commentary showed that investors were surprised by the poor performance of the credit card business, and this surprise caused the stock price decline, including analyst reports specifically stating that "Weakness in insurance leads was expected, but weaker results from the Creditcards.com property was somewhat surprising." ¶ 61.

Defendants also would have argued that Lead Plaintiffs could not establish loss causation for the stock price decline following the October 15 disclosure.  Defendants would have argued that, between May 1 and October 15, they repeatedly informed the market that Bankrate was experiencing significant lead quality problems that would continue to negatively impact its financial results for the remainder of the Class Period, as summarized above and detailed in the Rizio-Hamilton Declaration.  *See* ¶¶ 48-63.  Defendants would have pointed to the fact that numerous analysts downwardly adjusted their expectations for Bankrate's financial performance long before October 2012.  ¶¶ 49, 64.  Based on these facts, Defendants would have argued that the market understood before the October 15 disclosure that Bankrate's insurance lead business was troubled, and thus, the statements on October 15 concerning the insurance lead business were not the cause of Bankrate's stock price decline.

Defendants would have argued again that the actual cause of the stock price decline on October 16 was surprising negative news about Bankrate's credit card business.  In particular, they would have asserted that, on October 15, 2012, they disclosed that Bankrate's credit card business had continued to perform below expectations, and would do so for the foreseeable future.  They would have pointed to a significant amount of market commentary as confirmation that these credit card related disclosures are what surprised investors and drove the stock price

18

down on October 16, including analysts who reported that they were surprised "to the extent of the downside in credit cards," but not by the insurance business.  ¶ 65.

Lead Plaintiffs' damages expert, in consultation with Lead Counsel, evaluated all of Defendants' arguments concerning damages and loss causation.  Based on that analysis, Lead Plaintiffs' expert attempted to determine the likelihood that a reasonable juror would accept Defendants' contentions, and how those determinations would impact damages.  Following this evaluation, Lead Plaintiffs' expert concluded that the recoverable damages in this case, for both stock price declines on May 2, 2012 and October 16, 2012, were approximately $88 million.  ¶ 66.  Notably, however, had Defendants' loss causation arguments been accepted in full or even in part, damages would have been significantly lower than that.  Defendants contended that, at most, Lead Plaintiffs would be able to establish loss causation only for a portion of the October 16, 2012 stock price decline and for none for the May 2, 2012 decline.  *Id.*  Thus, damages could have been reduced to zero, and would have been no more than approximately $30 million, if damages were limited to only a portion of the stock price decline on October 16, 2012.  *Id.*

For all these reasons, Lead Plaintiffs and Lead Counsel respectfully submit that it is in the best interests of the Settlement Class to accept the immediate and substantial benefit conferred by the Settlement, instead of incurring the significant risk that the Settlement Class might recover a lesser amount, or nothing at all, after protracted and arduous litigation.

### 5.   The Ability of Defendants to Withstand a Greater Judgment

Although Defendants may have been able to pay a judgment in excess of the Settlement Amount, "defendants' ability to withstand a higher judgment . . . standing alone, does not suggest that the settlement is unfair." *D'Amato*, 236 F.3d at 86.  A "defendant is not required to 'empty its coffers' before a settlement can be found adequate."  *IMAX*, 283 F.R.D. at 191 (citation omitted).  Indeed, Courts have repeatedly recognized that this factor, standing alone,

does not weigh against approval of a settlement where, as here, the other factors weigh in favor of approving the Settlement.  *See id.*; *FLAG Telecom*, 2010 WL 4537550, at *19 ("the mere ability to withstand a greater judgment does not suggest the settlement is unfair") (citation omitted); *McBean v. City of New York,* 233 F.R.D. 377, 388 (S.D.N.Y. 2006) ("the ability of defendants to pay more, on its own, does not render the settlement unfair, especially where the other *Grinnell* factors favor approval").

**6.      The Range of Reasonableness of the Settlement Fund<br>in Light of the Best Possible Recovery and all the Attendant<br>Risks of Litigation Support Approval of the Settlement**

The last two substantive factors courts consider are the range of reasonableness of the settlement fund in light of (i) the best possible recovery and (ii) litigation risks.  In analyzing these factors, the issue for the Court is not whether the settlement represents the best possible recovery, but how the settlement relates to the strengths and weaknesses of the case.  The court "consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable."  *Grinnell*, 495 F.2d at 462 (citations omitted).  Courts agree that the determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum."  *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997) (citation and internal quotations omitted), *aff'd*, 117 F.3d 721 (2d Cir. 1997).  Instead, "in any case there is a range of reasonableness with respect to a settlement."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

Lead Plaintiffs submit that the Settlement is well within the range of reasonableness in light of the best possible recovery and all the attendant risks of litigation.  When weighed against the risks of continued litigation, the proposed Settlement for $18 million in cash is an excellent result.  As discussed above, if a jury or the Court had credited even some of Defendants'

arguments with respect to liability or damages, the Settlement Class might have recovered nothing or its recoverable damages might have been dramatically reduced.  In light of these risks, the Settlement provides a favorable outcome for the Settlement Class.

*   *   *

In sum, the *Grinnell* factors – including the expense and delay of further litigation, Lead Plaintiffs' well-developed understanding of the strengths and weaknesses of the case, and the significant risks of the litigation – support a finding that the Settlement is fair, reasonable and adequate.

## II.   THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE APPROVED

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable and adequate.  *See IMAX*, 283 F.R.D. at 192; *Bear Stearns*, 909 F. Supp. 2d at 270.  A plan of allocation is fair and reasonable as long as it has a "rational basis." *FLAG Telecom*, 2010 WL 4537550, at *21; *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 497 (S.D.N.Y. 2009).  Generally, a plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable.  *See IMAX*, 283 F.R.D. at 192.  Plans of allocation, however, need not be tailored to fit each and every class member with "mathematical precision."  *PaineWebber*, 171 F.R.D. at 133.  In determining whether a plan of allocation is fair and reasonable, courts give great weight to the opinion of experienced counsel. *See Giant Interactive*, 279 F.R.D. at 163 ("[i]n determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel") (citation omitted); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145 (S.D.N.Y. 2010) (same).

Here, the proposed plan of allocation (the "Plan of Allocation"), which was developed by Lead Plaintiffs' damages expert in consultation with Lead Counsel, provides a fair and

reasonable method to allocate the Net Settlement Fund among Settlement Class Members who submit valid Claim Forms.   In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the potential amount of estimated artificial inflation in the per share closing prices of Bankrate common stock which allegedly was proximately caused by Defendants' alleged false and misleading statements.   In calculating this estimated alleged artificial inflation, Lead Plaintiffs' damages expert considered price changes in Bankrate common stock in reaction to the alleged corrective disclosures, adjusting for price changes that were attributable to market or industry forces.   ¶ 78.

Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of Bankrate common stock during the Settlement Class Period that is listed in the Claim Form and for which adequate documentation is provided.   ¶ 79.   In general, the Recognized Loss Amount calculated will be the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase price and sales price of the stock, whichever is less. Notice ¶¶ 56-57.   Claimants who purchased and sold all their Bankrate shares before the first corrective disclosure on May 1, 2012 or who purchased and sold all their Bankrate shares between the two corrective disclosures (from May 2, 2012 through October 15, 2012), will have no Recognized Loss Amount as to those transactions because the level of alleged artificial inflation is the same on those dates.   ¶ 80.

The sum of a Claimant's Recognized Loss Amounts is the Claimant's "Recognized Claim."   The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.   Notice ¶¶ 60-61.

Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Class Members who suffered losses as result of the conduct alleged in the Action. ¶¶ 76, 82. Moreover, as noted above, as of October 16, 2014, more than 21,600 copies of the Notice, which contains the Plan of Allocation, and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Settlement Class Members and their nominees. *See* Fraga Decl. ¶ 8. To date, no objections to the proposed Plan of Allocation have been received. ¶ 83.

## III.   NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Notice to the Settlement Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974). The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable" – *i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Visa*, 396 F.3d at 114.

Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards. The Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7), including: (i) an explanation of the nature of the Action and the claims asserted; (ii) the definition of the Settlement Class; (iii) the amount of the Settlement; (iv) a description of the Plan of Allocation; (v) an explanation of the reasons why the Parties are proposing the Settlement; (vi) a statement indicating the attorneys' fees and costs that will be sought; (vii) a description of Settlement Class Members' right to opt-out of the Settlement Class

or to object to the Settlement, the Plan of Allocation or the requested attorneys' fees or expenses; and (viii) notice of the binding effect of a judgment on Settlement Class Members.

As noted above, in accordance with the Court's Amended Preliminary Approval Order, beginning on September 26, 2014 through October 16, 2014, the Claims Administrator has mailed 21,649 copies of the Notice by first-class mail to potential members of the Settlement Class and nominees.  *See* Fraga Decl. ¶¶ 2-8.  In addition, Lead Plaintiffs caused the Summary Notice to be published in *Investor's Business Daily* and transmitted over the *PR Newswire* on October 9, 2014.   Fraga Decl. ¶ 9.  Copies of the Notice, Claim Form, and Amended Stipulation were made available on the Settlement website maintained by GCG beginning on September 26, 2014, and copies of the Notice and Claim Form were made available on Lead Counsel's website. *See*  Fraga Decl. ¶ 11; Rizio-Hamilton Decl. ¶ 73.  This combination of individual first-class mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely-circulated publication, transmitted over the newswire, and set forth on internet websites, was "the best notice . . . practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2)(B); *see, e.g., Advanced Battery Techs.*, 298 F.R.D. at 182-83; *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *12-*13 (S.D.N.Y. Dec. 23, 2009).

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court approve the proposed Settlement as fair, reasonable and adequate and approve the Plan of Allocation as fair, reasonable and adequate.

Dated:  October 17, 2014

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**
 **& GROSSMANN LLP**

*/s/ John J. Rizio-Hamilton*
Max W. Berger
Salvatore J. Graziano
John J. Rizio-Hamilton
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Lead Plaintiffs Arkansas Teacher*
*Retirement System and Fresno County*
*Employees' Retirement Association and the*
*Settlement Class*

#832533